MATTER OF DE PERIO

In Section 212 (e) Proceedings

A-13981355

A-13982621

*Decided by Deputy Associate Commissioner August 1, 1968*

"Exceptional hardship" within the meaning of section 212(e) of the Immigration and Nationality Act, as amended, is established by an exchange visitor from the Philippines whose United States citizen child has an allergic condition which requires a hyposensitization program and there is evidence the child has a heart murmur and cardiac enlargement which should be carefully studied for an indeterminate period of time.

These cases have been certified to the Deputy Associate Commissioner, Travel Control.

The District Director of this Service at Buffalo denied the applications on February 15, 1968 on the ground that the departure from the United States of the applicants for a period of two years would not impose exceptional hardship on their two U. S. citizen children as contemplated by the statute. The District Director reopened and reconsidered the case on the applicants' motion with which they furnished additional evidence regarding their son Jeffrey's medical condition. On May 20, 1968 the District Director advised the applicants:

In accordance with your request, your applications were reopened for consideration of the further medical evidence presented regarding the health of your child Jeffrey. These reports have been carefully studied, including consultation with the U.S. Public Health Service. It has again been concluded that you have not established that travel to the Philippines would be injurious to the child and that the program of hyposensitization you wish him to undergo cannot be carried out in the Philippines. Accordingly, no change has been made in the order denying your applications.

The applicants have made other claims attesting to their belief that their departure from the United States would impose exceptional hardship upon their children by reason of conditions in the Philippines, such as the lack of educational facilities; the lack of adequate health and sanitary conditions; substandard housing;

and exposure to various diseases. They also contended that remuneration to medical practitioners is lower in the Philippines and that their children should not be exposed to the cultural changes involved in living in the Philippines for a period of two years. However, a basic issue to be resolved here is whether the additional factor of Jeffrey's physical condition warrants a finding that residence in the Philippines would constitute for him the exceptional hardship contemplated by the statute. To this end I have carefully examined the medical statements submitted.

Dr. John H. Kent, who has been Jeffrey's attending physician since October 1967, has summarized in a letter dated March 18, 1968 the child's condition with regard to his allergies. He concludes, "In view of the fact that both Jeffrey's parents have allergies, and that he shows definite positive skin tests, there is little doubt in my mind that Jeffrey is an allergic youngster. He is following a pattern typical in these youngsters starting with repeated upper respiratory tract infections manifested by wheezing and cough. Often these youngsters will then develop more classical types of bronchial asthma if not treated. It is recomended that Jeffrey continue on the program of hyposensitization weekly for the next few months and then monthly for a period of approximately two years."

In a letter dated February 22, 1968, Dr. Lydia T. Wright states, "During the course of a physical examination on the above patient for pharyngitis and bronchitis, a grade 2 ejection heart murmur was found along with cardiac enlargement. In the presence of this cardiac murmur, the age of the patient and cardiomegaly, I am strongly suspicious of congenital heart disease. The patient's condition warrants complete and careful study regular intervals at the Cardiac Center in Buffalo to detect any further cardiac vascular embarrassment such as with decompensation. I cannot say when cardiac catheterization will be indicated, but I am certain that at some time in the near future it will be necessary. This could well indicate surgery in this instance. In view of the above, this child should not be subjected to the vigors and excitement of travel to and from the Philippines."

Other letters in the record included one dated January 30, 1968 from Dr. John F. Hartman stating "Jeffrey De Perio . . . has been under my care since birth. He has a moderately severe, vibratory ejection heart murmur. This has been studied with electro-cardiograms and x-rays. These show a slightly enlarged heart which could indicate strain due to congenital heart disease. He will be restudied this summer. It certainly seems essential that he be

studied at regular intervals for comparison and for the possibility of further test (sic) which might be necessary. This usually requires a cardiac center such as we have here in Buffalo at Children's Hospital."

There is also a letter dated June 12, 1967 from Dr. Arno R. Hohn, Cardiologist, Children's Hospital, Buffalo in which he states, "At the conclusion of the examination in view of the questionable cardiomegaly and presence of a heart murmur I could not definitely exclude a congenital cardiovascular malformation of the heart. Accordingly, it is my recommendation that this child be periodically observed and re-evaluated from a cardiac standpoint. Currently there need not be any special diets or medications given to this child and activity need not be restricted."

Consultation was had on three occasions with the U. S. Public Health Service. On July 5, 1967, Dr. Peter C. Kelly, Chief Medical Officer of that Service at Buffalo stated, "Dr. Hohn is unable to make a diagnosis of organic heart disease. He does not feel that any dietary or activity restrictions are indicated. Hence, Jeffrey's cardiac murmur does not preclude travel to the Philippines." On March 6, 1968 Dr. Kelly wrote; "Dr. Arno Hohn's report of June 2, 1967 (letter dated June 12, 1967 referred to above relates to this report) represents the best evaluation of Jeffrey De Perio's heart murmur. The reports of Dr. Lydia Wright and Dr. John Hartman do not contain any new evidence. Hence, there is no reason to believe that travel would be injurious to Jeffrey's heart. Dr. John Kent's report of October 19, 1967 indicates that Jeffrey has an allergic condition which could make travel to the Philippines dangerous. I request that Jeffrey be re-examined by Dr. Kent. It is of special importance to know if hyposensitization has been completed. In addition, Dr. Kent should indicate the effectiveness of hyposensitization." On April 8, 1968 Dr. Kelly wrote, "Doctor Kent's summary of Jeffrey De Perio's case has been helpful. He indicates that Jeffrey is an allergic youngster who requires a hyposensitization program. I do not believe it a hardship to carry out such a program in the Philippines. Hence, it would not be difficult or dangerous to travel to the Philippines for two years."

Section 212(e) of the Immigration and Nationality Act requires that an alien who has been admitted to the United States as an exchange visitor must reside abroad for an aggregate period of at least two years before he may apply for an immigrant visa or adjust his status to permanent residence unless the foreign residence requirement is waived by the Attorney General.

That section also charges the Commissioner of Immigration and Naturalization with responsibility for determining whether the exchange visitor's departure from the United States would impose exceptional hardship upon the alien's U. S. citizen or lawfully resident alien spouse or child. In arriving at such a determination consultation may be had with the U. S. Public Health Service when a basis for the claimed hardship is the medical condition of the spouse or child and an advisory opinion solicited. Such consultation was had in the instant case and as a result the Service is faced with a divergency of opinions.

In the instant case there is evidence that the child, Jeffrey, has an allergic condition which requires a hyposensitization program which has just begun and may continue for perhaps another two years. Also there is evidence that Jeffrey has a heart murmur and cardiac enlargement which should be carefully studied for an indeterminate period of time. Two of the consulting physicians recommend that such observation be conducted at a cardiac center such as the one at Children's Hospital in Buffalo. On the other hand, a medical opinion has been received to the effect that it would not be dangerous for Jeffrey to travel to the Philippines and remain there with his parents for two years.

If Jeffrey's parents are required to return to the Philippines their children would of course accompany them. In the Philippines the applicants' financial resources will be sharply reduced. Whether or not adequate medical facilities are available in the Philippines and whether or not the applicants will be able to pay for such treatment, the fact remains that in the United States excellent facilities are present and are being utilized and the applicants can well afford to ensure that their child obtains the proper treatment. American facilities are generally regarded to be superior to those found in the Philippines.

As I have indicated above, some degree of hardship would be imposed on the applicants' children if their parents were required to reside in the Philippines for the requisite two year period regardless of their health. Jeffrey cannot be said to be a normal, healthy child. Hence, the hardship to him would be considerably more severe by reason of his physical condition and, in my opinion should properly be regarded as exceptional. Accordingly, I conclude that the applications for waiver should be granted and enter the following order.

*It is ordered* that the applications for waiver of the foreign residence requirement of section 212(e) of the Act be, upon the favorable recommendation of the Secretary of State, granted.